IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

AMERICAN MANAGEMENT                )
SERVICES, LLC d/b/a PINNACLE       )
        Plaintiff,                 )
                                   )
        v.                         )    Case No. 1:11cv442
                                   )
DEPARTMENT OF THE ARMY             )
        Defendant.                 )
                                   )

JAN 2 3 2012

## MEMORANDUM OPINION

At issue on cross motions for summary judgment in this Freedom of Information Act ("FOIA") action is whether the Department of the Army ("the Army") has improperly withheld documents relating to a dispute between corporate entities engaged in the provision of housing to members of the military and their families.  More specifically, the parties dispute:

(i)     (a) the adequacy of the Army's declarations, (b) the adequacy of the search for responsive documents, and (c) the accuracy of the *Vaughn* index;

(ii)    the application of Exemption 5, 5 U.S.C. § 552(b)(5), to (a) correspondence internal to the Army and (b) correspondence between the Army and Clark Realty Capital, LLC ("Clark"), one of the Army's business partners in the provision of housing; and

(iii)   the application of Exemption 4, 5 U.S.C. § 552(b)(4), to documents that Clark submitted to the Army in connection with a dispute between Clark and plaintiff American Management Services, LLC, d/b/a Pinnacle ("Pinnacle").

**I.[1]**

This FOIA action relates to an underlying dispute currently being litigated in Georgia state court between Pinnacle and a Clark-controlled entity.  This litigation grows out of the

_____

[1] The undisputed facts recited herein are derived from the record as a whole, including parties' pleadings and supporting documents.

-1-

provision of privatized family housing to members of the military and their families at Fort Benning in Georgia and Fort Belvoir in Virginia.  Pinnacle, Clark and the Army formed a variety of corporate entities for the purpose of providing this housing.  Specifically, at Fort Benning, Clark and Pinnacle formed Clark Pinnacle Benning LLC, of which Clark owns 70% and Pinnacle owns 30%.  Clark Pinnacle Benning LLC and the Army then formed Fort Benning Family Communities, LLC ("FBFC"), of which the Army owns 49% and Clark Pinnacle Benning owns 51%.  As a result, Clark controls both Clark Pinnacle Benning and FBFC, but with respect to FBFC, Clark is required to seek and obtain the Army's consent for certain major decisions.  Clark, in its role as managing member of FBFC, hired Pinnacle-subsidiary American Management Services East, LLC ("ASME") as property manager.

At Fort Belvoir, the arrangement is slightly different.  Clark and Pinnacle formed two entities, each owned 70% by Clark and 30% by Pinnacle: Clark Pinnacle Belvoir, LLC and Belvoir Holdings, LLC.  These two entities then formed Fort Belvoir Residential Communities, LLC ("FBRC").  The Army does not own any part of FBRC but leases the land used for housing to Belvoir Land, LLC, which is owned 49% by the Army and 51% by Clark Pinnacle Belvoir.  Belvoir Land, in turn, subleases the land to FBRC.  FBRC also hired Pinnacle-subsidiary ASME as property manager.  For purposes of simplicity, and following the example set by the parties in their briefs, ASME will be referred to as Pinnacle from this point forward.

In 2010, FBFC terminated its property management contract with Pinnacle, alleging numerous instances of fraud and mismanagement.  FBFC also contemporaneously initiated litigation against Pinnacle in Georgia state court seeking, *inter alia*, a declaratory judgment that FBFC's contract with Pinnacle was automatically terminated as a result of Pinnacle's alleged wrongdoing.  Clark, as the managing member of FBFC, made the decision to replace Pinnacle as

-2-

property manager and initiate the litigation, but was required by contract to obtain the Army's approval before doing either. Clark did so; the Army approved both actions. In connection with obtaining the Army's approval, Clark, on or about May 6, 2010, provided the Army with a binder of materials prepared by Clark's outside counsel, Kirkland & Ellis, regarding its investigation into Pinnacle's alleged wrongdoing as property manager. After the initiation of litigation, Clark and the Army continued to correspond concerning the status of the litigation and Pinnacle's termination.[2]

In the Georgia state action discovery, Pinnacle sought the binder provided by Clark and any other documents "concerning or relating to any communications" between FBFC or FBRC – both controlled by Clark – and the Army regarding the Fort Benning and Fort Belvoir housing projects. *See* Army Ex. 11, 12. FBFC and FBRC objected based, *inter alia*, on "the common interest privilege to the extent the request seeks documents that involve legal strategy or analysis that are otherwise protected by the attorney-client privilege, work produce [sic] doctrine, or any other privilege or immunity." *Id.* Pinnacle chose not to compel or to litigate the validity of the objection, choosing instead to require the Army to produce the same documents pursuant to FOIA. In fact, Pinnacle states in its FOIA request that nothing being requested has not already been requested and withheld, presumably in the Georgia state litigation.[3]

---

[2] The Georgia state action is in the Superior Court of Muscogee County and captioned *Fort Benning Family Communities, LLC v. American Management East LLC*, Case No. 10-cv-2025. FBRC is also a plaintiff in the Georgia state action. It is worth noting that Pinnacle has since commenced litigation against Clark in Virginia state court.

[3] Although the matter is not decided on these grounds, there is no doubt that this entire action is an exercise in forum shopping by Pinnacle, which obviously made a choice to seek disclosure of the documents in issue under FOIA rather than to proceed to litigate the discovery objections asserted with respect to the same documents in the Georgia state action. *See* Transcript of Summary Judgment Hearing (Doc. 40), 7:15-9:24. It is well-established that "[t]he primary purpose of the FOIA was not to benefit private litigants or to serve as a substitute for civil

-3-

On October 29, 2010, Pinnacle, through counsel, filed its FOIA request with the Army, seeking documents relating to the Clark-Pinnacle-Army dispute.  Specifically, Pinnacle sought the release of the following documents:

(i)     all records referring directly to or directly related to pending litigation in Georgia and Virginia that involves Pinnacle;

(ii)    all records Clark, its affiliates, and/or representatives either submitted to or requested from the Army;

(iii)   any writings or documents generated by a government official that summarize and/or refer to anything a Clark employee submitted to or represented to the Army concerning Pinnacle or any of Pinnacle's employees; and

(iv)    any writings or documents generated by a government official that were sent or directed to a Clark representative and that contain specific references to Pinnacle, to include references to Pinnacle's employees, representatives of Pinnacle, the pending litigation involving Pinnacle, or Pinnacle's contract performance.

After receiving Pinnacle's request, the Army conducted a search and identified 977 pages of responsive records.  These records fall into two general categories: (i) materials in the Kirkland & Ellis binder submitted by Clark to the Army on or about May 6, 2010, and (ii) correspondence and memoranda, some of which were internal to the Army, some of which were between the Army and Clark or Clark's outside counsel, and some of which were between the Army, Clark and Pinnacle.

On February 23, 2011, the Army provided Pinnacle an interim response, releasing 48 pages of documents without redactions and indicating that the remaining documents were under review.  On March 1, 2011, Pinnacle's counsel acknowledged that Pinnacle had received the 48

---

discovery." *Baldrige v. Shapiro*, 455 U.S. 345, 360 n. 14 (1982).  Yet, that is precisely what Pinnacle appears to be doing here, namely using FOIA to benefit itself in the Georgia state action and as a substitute for civil discovery.  Nevertheless, absent a clear indication from Congress that such forum shopping is impermissible, Pinnacle's choice to seek the documents *via* FOIA rather than in discovery in the Georgia state action cannot be the basis for any decision here under FOIA.

pages of documents but objected to the release, arguing the released records were not responsive to the FOIA request. On April 22, 2011, plaintiff filed this lawsuit concerning the Army's lack of a complete response and requesting, *inter alia*, an order that the Army produce all records responsive to Pinnacle's request and a *Vaughn* index for all responsive documents, including those withheld.

On May 20, 2011, the Army sent Pinnacle its determination regarding the remaining responsive records. In this regard, the Army released approximately 7 additional pages of documents. The Army also informed Pinnacle that approximately 368 additional pages were releasable without redactions, but were likely already in Pinnacle's possession, and 15 more pages were releasable without redactions but contained only standard boilerplate language regarding the handling of official emails. *See* Army Ex. 1, Attachment P. Pinnacle nonetheless requested and received these 383 pages of documents. The Army has withheld the remaining 539 pages of documents on the following grounds:

(i)      The Army asserts Exemption 4 over the majority of Clark-submitted documents, withholding them in their entirety as confidential and privileged materials submitted by Clark to the Army.

(ii)     The Army asserts Exemption 5 over correspondence and memoranda internal to the Army and between the Army and Clark, withholding them as privileged communications pursuant to the attorney-client or deliberative process privileges, and the common interest doctrine where the communications were with Clark.

(iii)    The Army withheld the names of Clark employees, Clark's outside counsel, and Army personnel other than Senior Executive Service members and General Officers, as well as the personal contact information for all individuals, pursuant to Exemption 6, 5 U.S.C. § 552(b)(6).[4]

---

[4] There is no dispute regarding the Army's application of Exemption 6, which allows agencies to withhold information contained in "personnel," "medical," and "similar files" where disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Pinnacle argues that as a result of the Exemption 6 redactions, it is impossible to determine whether Exemption 5 is properly applied, but Pinnacle does not dispute the application of Exemption 6 itself, which the Army has justified in the Buchholz Declaration and *Vaughn* index.

On May 24, 2011, plaintiff filed an administrative appeal regarding the May 20 determination. On July 12, 2011, the Army informed plaintiff that, because the request was now the subject of ongoing litigation, it would not take any administrative action on the appeal.[5] On July 26, the Army supplied a 268-page *Vaughn* index describing each of the 977 pages of responsive documents and, for each document, whether it was released, partially released, or withheld, and if withheld, for what reason.

## II.

FOIA provides that, subject to certain statutory exemptions, federal agencies shall "upon any request for records which... reasonably describes such records... make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). In enacting FOIA, Congress sought "a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to a functioning democratic society." *Wickwire Gavin, P.C. v. U.S. Postal Service*, 356 F.3d 588,

---

*See* Buchholz Declaration ¶¶ 61-63. As the Fourth Circuit has held, Exemption 6 redactions are proper where employees' privacy interests outweigh the public interest in disclosure of their names and contact information. *See Judicial Watch, Inc. v. U.S.*, 84 Fed.Appx. 335, 339 (4th Cir. 2004). In this matter, there is virtually no public interest in the disclosure of the names or contact information in question, and notably, Pinnacle makes no argument to the contrary. Thus any minimal public interest in disclosure is outweighed by the individuals' substantial privacy interest. *Id.*

[5] Although in its Answer, the Army initially claimed Pinnacle had failed to exhaust administrative remedies, the Army does not move for dismissal on that ground, likely because in its Complaint, Pinnacle claims the Army failed to comply with this FOIA request in a timely fashion, and in this circuit, "when an agency fails to comply in a timely fashion to a proper FOIA request, it may not insist on the exhaustion of administrative remedies." *Pollack v. Department of Justice*, 49 F.3d 115, 118-119 (4th Cir. 1995). In any event, since exhaustion of administrative remedies under FOIA is not a jurisdictional requirement, and the Army has not moved for dismissal on that ground, it is appropriate to proceed to review the matter on the merits. *See Hidalgo v. F.B.I.*, 344 F.3d 1256, 1258 (D.C. Cir. 2003) (under FOIA, exhaustion is not a jurisdictional requirement). While some courts have treated exhaustion as a jurisdictional requirement in the FOIA context, those decisions are neither persuasive nor controlling here. *See Hull v. I.R.S., U.S. Dept. of Treasury*, 656 F.3d 1174, 1181-1182 (collecting cases).

591 (4th Cir. 2004) (*quoting FBI v. Abramson*, 456 U.S. 615, 621 (1982)) (quotation marks omitted). Yet, Congress also recognized that "legitimate governmental and private interests could be harmed by release of certain types of information," and therefore Congress explicitly exempted nine categories of information from FOIA's general disclosure mandate. *Id.* at 592. But it is clear that disclosure remains the thrust of FOIA, as courts have been uniform in providing that "FOIA exemptions should be narrowly construed to favor disclosure." *Hanson v. U.S. Agency for Intern. Development*, 372 F.3d 286, 290 (4th Cir. 2004). And further, it is the government that bears the "burden of demonstrating that a requested document falls under an exemption," which the government can satisfy "by describing the withheld material with reasonable specificity and explaining how it falls under one of the enumerated exemptions." *Id.*

In general, FOIA disputes are, and should be, resolved by way of summary judgment. *Id.* This is so because FOIA cases generally involve disputes not about triable issues of fact, but rather how the law is to be applied to the documents withheld; as a result, once the documents at issue have been properly identified, typically only questions of law remain. *See Wickwire Gavin,* 356 F.3d at 591, *Ethyl Corp. v. U.S. E.P.A.*, 25 F.3d 1241, 1246 (4th Cir. 1994). Accordingly, summary judgment in favor of the agency is appropriate pursuant Rule 56, Fed.R.Civ.P. where the agency's declarations "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Spannaus v. U.S. Dept. of Justice*, 813 F.2d 1285, 1289 (4th Cir. 1987) (*quoting Barney v. Internal Revenue Service*, 618 F.2d 1268, 1272 (8th Cir. 1980)) ("If the [g]overnment fairly describes the content of the material withheld and adequately states its grounds for

-7-

nondisclosure, and if those grounds are reasonable and consistent with the applicable law, the district court should uphold the [g]overnment's position."). And importantly, courts are "entitled to accept the credibility of the [agency's] affidavits, so long as [there is] no reason to question the good faith of the agency." *Spannaus*, 813 F.2d at 1289 (*quoting Barney*, 618 F.2d at 1272).

### III.

Analysis properly begins with consideration of Pinnacle's objections to the Army's declarations, the adequacy of the Army's search, and the accuracy of the Army's *Vaughn* index. If these objections are successful, then the Army cannot prevail on summary judgment and therefore it is important to address these objections prior to considering whether the Army has demonstrated that the withheld documents fall within the claimed exemptions. Each objection is separately addressed below.

### A.

Pinnacle first argues that the 24-page declaration provided by Ronald J. Buchholz, Associate Deputy General Counsel for the Army's Office of General Counsel (OGC), fails for lack of personal knowledge and hence may not properly be considered as part of the FOIA decisional calculus. It is, of course, true that pursuant to Rule 56(c), Fed.R.Civ.P., a declaration submitted for purposes of summary judgment must be based on personal knowledge. In the FOIA context, the personal knowledge requirement is met where a declarant has personal knowledge of the procedures used in handling the request and familiarity with the documents at issue. *See Spannaus*, 813 F.2d at 1289; *Schoenman v. F.B.I.*, 575 F.Supp.2d 166, 171-172 (D.D.C. 2008). Accordingly, "FOIA declarants may include statements in their declarations based on information they have obtained in the course of their official duties." *Barnard v. Department of Homeland Sec.*, 598 F.Supp.2d 1, 19 (D.D.C. 2009). For example, it is well-

-8-

established that FOIA declarants are not required to have personally conducted a search in order to provide a declaration describing the search. *See Maynard v. C.I.A.*, 986 F.2d 547, 560 (1st Cir. 1993); *Wickwire Gavin,* 330 F.Supp.2d at 598. Furthermore, "[b]ecause a [FOIA] declarant is deemed to have personal knowledge if he has a general familiarity with the responsive records and procedures used to identify those records, the declarant is not required to independently verify the information contained in each responsive record." *Barnard*, 598 F.Supp.2d at 19.

The Buchholz Declaration, which describes the Army's search for responsive documents, the contents of responsive documents, and the application of the claimed exemptions, contains multiple statements describing Buchholz's personal knowledge. First, Buchholz avers at the outset that his declaration is based on "personal knowledge and information available to the agency." Buchholz Declaration ¶ 1. Pinnacle's attack on Buchholz's reliance on "information available to the agency" is unpersuasive; as discussed above, this reliance is entirely appropriate in the FOIA context as it reflects that Buchholz acquired some information to which he avers in the course of his official duties. *See Barnard*, 598 F.Supp.2d at 19 ("Plaintiff now focuses on the fact that the declarants were *told* certain information rather than obtaining the information from a review of relevant documents. The Court finds this to be a distinction without a difference."). Next, Buchholz provides that, in his capacity as Associate Deputy General Counsel, he advises the Army on FOIA matters. *See* Buchholz Declaration ¶¶ 1, 13. Specifically, Buchholz states that in this matter he was "assigned by the Army to provide the Court the information available to the Army." *See* Buchholz Declaration ¶ 1. Furthermore, Buchholz also avers that either he, or the individual whom he supervises, provided legal advice on this particular request while it was pending. *See* Buchholz Declaration ¶ 13 ("In cases such as here, where either [my subordinate] or I provide legal advice... on a specific FOIA request during its pendency in the initial

determination phase, we conflict ourselves out of any substantive appellate review, and another OGC attorney conducts that review."). In addition to the statements that explicitly relate to his personal knowledge, Buchholz also demonstrates his familiarity with the procedures and documents at issue through his extremely detailed descriptions of each, as well as through his position and job responsibilities. These averments satisfy the FOIA personal knowledge requirement, as it is clear that personal knowledge may be inferred from the affidavit itself "by considering the affiant's position and job responsibilities" and other contextual factors. *Center for Auto Safety v. National Highway Traffic Safety Admin.*, 93 F.Supp.2d 1, 11 (D.D.C. 2000); *see also Roberts v. Cessna Aircraft Co.*, 289 Fed. Appx. 321, 324 (10th Cir. 2008) ("Thus, the failure of an affidavit to state that the statements therein were based on personal knowledge does not prevent that affidavit from being properly considered.").

As a result, it is apparent from his specific averments regarding personal knowledge, his position in the Army, his role in this matter, and the contents of declaration itself, that Buchholz has personal knowledge of the procedures used in handling Pinnacle's request and familiarity with the documents at issue. *See Spannaus*, 813 F.2d at 1289. *See also Willard v. I.R.S.*, 776 F.2d 100, 104 (4th Cir. 1985) ("[Declarant's] personal knowledge is readily demonstrated by his position as the head of the [division] and by his statement that he was familiar with the requests for information filed.").

It is useful to note that the Buchholz Declaration stands in stark contrast with the affidavit in *Prison Legal News v. Lappin*, a case relied on by Pinnacle, which failed for lack of personal knowledge. There, the affiant – whose affidavit rejected for lack of personal knowledge – was a paralegal who provided only a conclusory affidavit that generally asserted the reasonableness of the search without outlining the search procedures typically followed or whether he knew if such

procedures were followed in that instance. *See Prison Legal News v. Lappin*, 603 F. Supp. 2d 124, 127 (D.D.C. 2009). By contrast, Buchholz, in his declaration, does both; he sets forth the search procedures and that they were followed in this instance.

Moreover, even assuming the Buchholz Declaration were somehow found to be deficient with respect to personal knowledge, this deficiency has been cured by the Army's submission of several supplemental declarations. In this respect, Major Toshene Fletcher and Paul D. Cramer, who were responsible for the Army's search for responsive records, provided declarations stating that they had reviewed the Buchholz Declaration and that it accurately described searches they conducted and the results of the searches. *See* Fletcher Declaration ¶ 3, Cramer Declaration ¶ 3.[6] Further, Joseph F. Calcara, the Deputy Assistant Secretary of the Army for Installations, Housing, and Partnerships, is the senior Army official responsible for the housing projects at issue and is the person who maintained all responsive documents. Calcara also provided a declaration confirming the accuracy of the Buchholz Declaration with respect to the relationship

---

[6] Pinnacle also argues the declarations submitted by Buchholz, Fletcher, Cramer, and Clark's corporate counsel, David H. Brody, fail because they are certified, pursuant to 28 U.S.C. § 1746, as follows: "under penalty of perjury that the foregoing is true and correct *to the best of my knowledge and belief*" for Buchholz and Brody, and "under penalty of perjury that the foregoing is true and correct *to the best of my knowledge*" for Fletcher and Cramer (emphasis added). These certifications are sufficient, as they substantially comply with the verification requirements of § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (declaration submitted only "under penalty of perjury" and not stating "true or correct" was sufficient for substantial compliance with § 1746); *Verrier v. Sebelius*, No. CCB-09-402, 2010 WL 1222740, at *3-4 (D.Md. 2010) (inclusion of the phrase "to the best" is not cause for striking § 1746 declaration). Furthermore, Buchholz's use of the word "belief" is permissible (and even logical) given that, as he may in the FOIA context, he is averring to actions taken by others. *See Hamilton v. Mayor & City Council of Baltimore*, --- F.Supp.2d ----, 2011 WL 3439252, at *14 (D.Md. 2011) ("true and accurate to the best of [my] knowledge and belief" is sufficient for § 1746); *Kersting v. U.S.*, 865 F.Supp. 669, 677-678 (D.Hawai'i 1994) ("true and correct to the best of my knowledge and belief" is sufficient for § 1746). To the extent it is not distinguishable, the case relied upon by Pinnacle, *Malek v. Martin Marietta Corp.*, 859 F.Supp. 458 (D.Kan. 1994), is neither controlling nor persuasive.

between the Army and Clark and the Army's interests in the relevant state court litigation.[7] In sum, Pinnacle's objections to the adequacy of the Buchholz Declaration fail both because Buchholz has adequate personal knowledge of the procedures used in processing Pinnacle's FOIA request and because he is familiar with the documents at issue. In any event, even if that were not so, the supplemental declarations cure any alleged deficiency.[8]

## B.

Pinnacle next attacks the adequacy of the Army's search for documents. In evaluating the adequacy of a search, "the relevant question is not whether every single potentially responsive document has been unearthed… but whether the agency has demonstrated that it has conducted a search reasonably calculated to uncover all relevant documents." *Ethyl Corp.*, 25

---

[7] Pinnacle initially attacked the Calcara Declaration because it inadvertently omitted the words "under penalty of perjury," but Calcara, upon realizing his mistake, filed a supplemental declaration with the necessary language. *See American Management Services, LLC d/b/a Pinnacle v. Department of Army*, No. 11cv442 (E.D. Va. Oct. 6, 2011) (Doc. 29). Pinnacle's other attacks on the Calcara Declaration are not relevant to the personal knowledge requirement, but rather relate to the Army's decision to support Clark in terminating Pinnacle at Fort Benning and Fort Belvoir, discussed *supra*.

[8] Pinnacle also attacks the declaration provided by David H. Brody, Clark's corporate counsel. Specifically, Pinnacle objects to Brody's statement that "[i]t is [his] understanding" that Clark had no obligation to provide the documents at issue and is entitled to withhold them from the public. *See* Brody Declaration ¶¶ 3, 5. Pinnacle argues Brody's mere "understanding" is not sufficient for personal knowledge. Pinnacle also objects based on the best evidence rule where Brody references a letter in which Clark objects to the release of documents. *See* Brody Declaration ¶ 4. Pinnacle's objections are rendered moot as these particular statements are not relied on in resolving the issues presented. The Calcara Declaration provides that the Army "cannot dictate the type, or quality, of information" provided to it by Clark, that the Army "could not require that Clark provide it with any written documentation," and that "Clark was always clear in stating that it believed the documentation provided was privileged and confidential and should not be released[.]" Calcara Declaration ¶¶ 4, 7. In addition, Brody states in his declaration, without the "my understanding" qualification, the documents at issue would not customarily be released to the public because they reflect work product of Clark's outside counsel and contain elements of FBFC and FBRC's business and financial information. *See* Brody Declaration ¶ 5. These unqualified statements sufficiently establish (i) that Clark had no obligation to provide the documents at issue, and (ii) that Clark would not customarily release them to the public.

F.3d at 1246 (quotation marks and citations omitted).  To meet its burden, an agency must provide a declaration that is "reasonably detailed, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched so as to give the requesting party an opportunity to challenge the adequacy of the search." *Id.* at 1247 (quotation marks and citations omitted). *See also Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 364 (4th Cir. 2009).

The Buchholz Declaration describes in detail both FOIA search procedures generally employed by the Army and the search conducted in connection with this FOIA request. Specifically, the Buchholz Declaration describes which Army divisions received Pinnacle's request and whether they maintained any responsive documents.  The Army's search revealed that all responsive records were maintained by Calcara, the senior official responsible for the underlying matters.  The Buchholz Declaration then describes the electronic and manual search of Calcara's emails and files that resulted in the 977 pages of responsive documents. *See* Buchholz Declaration ¶¶ 2-43.

Despite this detailed description, Pinnacle nonetheless argues the search is inadequate because it failed to reveal three categories of documents.  The first category of allegedly missing documents is contractually-required documents, such as the Army's written approval to replace Pinnacle as property manager and initiate the Georgia state action.  The Army's response makes clear that these documents are not missing, but rather they simply do not exist; there was no written approval given by the Army when it agreed to Clark's proposed course of action. Pinnacle does not specify what other contractually-required documents may exist.  As a result, this attack on the adequacy of the search fails.

The second category of allegedly missing documents is "any documents whatsoever regarding Fort Belvoir." Again, Pinnacle's attack is inaccurate; the *Vaughn* index describes many documents that relate to Fort Belvoir. *See, e.g., Vaughn* index, Bates No. 56, 63-64, 90-91, 248-249, 307, 404-419. Thus, this attack also fails.

The third category of allegedly missing documents is audited financial statements. Once, again, the Army's response makes clear that these documents are not missing, but rather they are not in the Army's possession. Pinnacle provides no further detail regarding specifically what financial statements it believes the Army has in its possession but are not listed in the *Vaughn* index, and mere speculation is "insufficient to raise a material question of fact with respect to the adequacy of the agency's search." *Oglesby v. U.S. Dept. of Army*, 920 F.2d 57, 68 n. 13 (D.C. Cir. 1990). As a result, this attack fails, as well.

In addition, the adequacy of the Army's search is apparent from Pinnacle's own assertions. Pinnacle stated that "[f]rom the outset the Army knew and was told by [Pinnacle]'s counsel, all requested records should be in the custody and control of one person, Mr. Calcara[.]" *See* Pinnacle Br. (Doc. 22), 8 n. 6. This was confirmed in the Army's search, and those documents in Calcara's possession are the responsive documents identified by the Army in its *Vaughn* index.

## C.

Pinnacle next argues that because the *Vaughn* index contained certain errors, it should be disregarded in its entirety. In this respect, Pinnacle points to two emails, the contents of which were withheld pursuant to attorney-client privilege, that were copied to a third party and thus could not have been privileged. Pinnacle's objection prompted the Army to conduct additional document review and to release those two emails, as well as a letter attached to one of the emails.

*See* Army Ex. 10. Pinnacle also argues that there are additional emails with copy recipients not identified in the *Vaughn* index who might also be third parties, thus destroying privilege. In response, the Army conducted further review and determined that all of the copy recipients were Clark employees with the exception of a single email, which the Army promptly released. *See* Army Reply. Br. (Doc. 26), 13-14 n. 16. The Army also voluntarily reviewed other documents that it initially withheld and ultimately released an additional nineteen pages. *Id.*

Pinnacle argues that inconsistencies between the contents of the some of these released documents and the *Vaughn* index is evidence of bad faith. The Army concedes that there were some inconsistencies, but correctly argues that these few errors are not sufficient grounds for the striking the entire index or questioning the good faith of the Army. It is well to recall that there were almost a thousand pages of documents gathered by the Army in response to Pinnacle's request and, as the Fourth Circuit has recognized:

> [I]n some cases the sheer magnitude of the requests and the disclosure makes it unrealistic to expect that a *Vaughn* index would be a work of art or contain the uniform precision that a substantially smaller universe of requested documents would entail. Parties who frame massive and all-inclusive requests for documents should expect some fall-off from perfection when the agency responds.

*Rein*, 553 F.3d at 370 n. 24. *See also Pub. Citizen v. Dep't of State*, 276 F.3d 634, 645 (D.C. Cir. 2002) (subsequent releases are not evidence of bad faith).

Pinnacle also claims some inconsistencies that the Army disputes. Specifically, Pinnacle takes issue with two litigation reports prepared by Clark's outside counsel which appear on Clark letterhead. Pinnacle suggests that the letterhead should be that of Clark's outside counsel rather than of Clark. Pinnacle also argues that the descriptions for those reports cannot be accurate because, although one report is dated months after the Georgia state action commenced, the description states that the document contained information submitted to obtain the Army's

approval for initiating the action. In response, the Army explains that the memoranda were prepared by Clark's outside counsel with Clark in-house counsel and then placed on Clark letterhead and that the later-released report contained some updated information that had been provided to the Army prior to the litigation, so the description is accurate. *See* Army Reply Br. (Doc. 26), 13. There is no reason to doubt the Army's explanation or good faith in this regard.

## IV.

Given the failure of Pinnacle's objections to the Army's declarations, the search, and the accuracy of the *Vaughn* index, it is now appropriate to address whether, on this record, the Army has demonstrated that the documents withheld fall within the claimed FOIA exemptions. In this regard, an agency seeking to withhold information must provide "a relatively detailed justification" that provides a rationale for each exemption invoked and correlates each exemption to particular documents or parts of documents. *See King v. Dep't of Justice*, 830 F.2d 210, 218-219 (D.C. Cir. 1987). And, when relying on a *Vaughn* index and declaration, "[s]pecificity is the defining requirement." *Id.* In other words, the Army must provide "sufficient factual information as to the document's nature or content from which the district court can independently assess the applicability of the claimed exemption." *Rein*, 553 F.3d at 370.

The withheld documents fall into three general categories, each of which will be addressed in turn:[9]

> **Category A:** Correspondence and memoranda internal to the Army withheld under Exemption 5. This includes two overlapping subgroups: (i) those documents that the Army claims are privileged attorney-client communications, and (ii) those documents that the Army claims are subject to the deliberative process privilege.

---

[9] A few memoranda submitted by Clark to the Army after the Army's decision to agree to the Georgia state action are withheld pursuant to both Exemptions 4 and 5 and thus fall within both Categories B and C. Also, as discussed, *supra*, there are Exemption 6 redactions on many documents that are not in dispute.

**Category B:**  Correspondence between the Army and Clark or the Army and Clark's outside counsel withheld under Exemption 5 pursuant to the common interest doctrine. All of these documents are withheld as privileged attorney-client communications, and almost all are also withheld as subject to the deliberative process privilege.

**Category C:**  Documents submitted by Clark to the Army withheld under Exemption 4. The vast majority of these documents were in the binder submitted on or about May 6, 2010.

### A.

Category A consists of correspondence – mostly e-mails and at least one memorandum – entirely internal to the Army and withheld pursuant to Exemption 5.  Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  Accordingly, a document withheld pursuant to Exemption 5 must satisfy two requirements: (i) it must be inter-agency or intra-agency, and (ii) it must fall within a discovery privilege. *See Rein*, 553 F.3d at 371.  Exemption 5 encompasses, *inter alia*, "the attorney-client privilege, the attorney-work product privilege, and the deliberative process privilege." *Id.*

It is clear, and the parties do not dispute, that all Category A documents are intra-agency memoranda or letters, thus satisfying the first requirement.  The only dispute is whether the documents fall within the attorney-client or deliberative process privilege.  For the majority of Category A documents, the Army invokes both.

### 1.

The attorney-client privilege "is not limited to communications made in the context of litigation or even a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter." *Rein*, 553 F.3d at 375.  It encompasses both the giving of professional advice by a lawyer and the giving of information to the lawyer for the purposes of obtaining such advice. *Id.*  For Category A documents, the Army is "the client" and the Army lawyers are "the

attorneys." The agency must demonstrate the confidential nature of the information, pursuant to either an express or an implied grant of confidentiality, and that the privilege was not waived by disclosure to third parties. *Id.*

In this respect, the Buchholz Declaration provides that those communications withheld pursuant to the attorney-client privilege involved privileged communications for which "[t]he confidentiality... was either expressly stated or was implied from the subject matter of the communication: discussions regarding issues associated with the termination of Pinnacle as the property manager; the possibility of litigation arising from these issues; the effects of that litigation; and potential courses of action." Buchholz Declaration ¶ 59. The *Vaughn* index then specifically identifies all those communications withheld pursuant to the attorney-client privilege and further identifies the parties to those communications, either by name or position, the date of the communication, and the mode of communication.[10]

Pinnacle concedes that Exemption 5 applies to internal Army communications consisting of the giving and receiving of legal advice and disputes only that some of those communications may have been shared with Clark or Clark's outside counsel. *See* Pinnacle Br. (Doc. 22), 25 n. 14. At oral argument, Pinnacle confirmed this, reiterating that its sole concern with respect to Category A documents withheld pursuant to the attorney-client privilege was the possible disclosure of the documents to Clark. *See* Transcript of Summary Judgment Hearing (Doc. 40), 13:9-14:6, 44:6-49:4. To facilitate resolution of Pinnacle's concern, the Army was required to provide a supplemental declaration addressed whether Category A documents listed as strictly internal Army communications and withheld pursuant to the attorney-client privilege were

---

[10] No attorney is listed on an email dated May 7, 2010 from J. Hansen (OASA) to an OASA action officer. *See Vaughn* index, Bates No. 382. The invocation the attorney-client privilege in this instance must have been an error, and this document should be treated as one solely withheld pursuant to the deliberative process privilege.

shared with any non-Army personnel, such as Clark or Clark's outside counsel. The Army complied, and the supplemental declaration adequately addressed Pinnacle's sole concern, as it confirms that these Category A documents were not shared outside the Army. *See American Management Services, LLC d/b/a Pinnacle v. Department of Army*, 11cv442 (E.D. Va. Dec. 6, 2011) (Doc. 39). As Pinnacle raises no other objection with respect to the Army's application of the attorney-client privilege, and because the Army has provided sufficient factual information for an independent evaluation of the applicability of the exemption and there is no reason to question the Army's good faith, the Army has met its burden of demonstrating that it properly withheld those Category A documents for which it invokes the attorney-client privilege.

**2.**

The vast majority of Category A documents are withheld pursuant to both the attorney-client and deliberative process privilege, but since the Army has met its burden with respect to those withheld pursuant to the attorney-client privilege, the application of the deliberative process privilege need only be evaluated with respect to those few Category A documents withheld solely on the basis of the deliberative process privilege.

To withhold documents pursuant to the deliberative process privilege, an agency must provide sufficient facts for a reviewing court to determine that such documents are (i) predecisional, *i.e.*, "prepared in order to assist an agency decisionmaker in arriving at his decision", and (ii) deliberative, *i.e.*, "reflect[ing] the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes." *Rein*, 553 F.3d at 372-373. Properly withheld documents may include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* Notably, "while the government

-19-

need not anchor documents to a single, discrete decision amidst ongoing deliberative processes..., an overly lax construction of the term 'predecisional' submerges the rule of disclosure under the exemption." *City of Virginia Beach, Va. v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1255 (4th Cir. 1993).

Pinnacle disputes the application of the deliberative process privilege for some or all of the relatively few Category A documents withheld solely on this ground. First, in light of the Exemption 6 redactions, Pinnacle argues that without the identities of all parties on a communication, it is impossible to determine whether the privilege is properly applied. *See Ethyl Corp.*, 25 F.3d at 1250 ("[W]here the list fails to identify either the author or its recipient, those persons' relationships to the decisionmaking process cannot be identified and it becomes difficult, if not impossible, to perceive how the disclosure of such documents would result in a chilling effect upon the open and frank exchange of opinions within the agency."). It is noteworthy, however, that wherever the Army redacted an individual's name, it provided the person's position or department. This may well suffice to overcome this objection. *See Rein*, 553 F.3d at 366-367 ("*Ethyl Corporation* left open, as do we, the possibility that the district court may be able to determine whether the deliberative process privilege applies without knowing the author and recipient.").

Pinnacle next argues that those communications dated after the Army's decision to consent to litigation and to replace Pinnacle as property manager cannot be pre-decisional. The premise of this argument is flawed, as there may have been additional decisions made after these initial decisions, including decisions relating to the appointment of a new property manager, when and how to inform certain constituencies about the Pinnacle termination and the reasons

for the termination, and whether to continue to approve litigation costs. *See* Buchholz Declaration ¶ 56; Calcara Declaration ¶ 6.[11]

Although generally Pinnacle's arguments are unpersuasive, there is, at this time, insufficient factual information to determine conclusively whether each withheld document relates to the Army's deliberative process. *See Rein*, 553 F.3d at 368-369. For example, in an email dated June 9, 2010, the *Vaughn* index states that the text of the email was withheld where the content related to "recent discussion with Clark representatives concerning termination of Pinnacle from management of Fort Benning family housing." *See Vaughn* index, Bates No. 293-295. Although there may have been decisions made subsequent to the decision to terminate Pinnacle, it is not possible, based on that description alone, to conclude that this communication was pre-decisional rather than post-decisional. In addition, descriptions that state only that a communication contained "pre-decisional opinions between subordinates and superiors relating to ongoing Pinnacle-related matters," fall short of what is needed to evaluate the application of the deliberative process privilege. *See, e.g., Vaughn* index, Bates No. 382-383. Although descriptive information need not be "so detailed that it would serve to undermine the important deliberative processes protected by Exemption 5," the current *Vaughn* index is not sufficient with respect to those Category A documents withheld solely on deliberative process grounds. *Rein*, 553 F.3d at 368-369. Given the relatively few documents at issue, this matter can more expeditiously be resolved by way of an *in camera* inspection rather than requiring an amended

---

[11] Pinnacle also argues that the deliberative process privilege should not apply because the Army is not acting as agency making policy decisions but merely as a party to contracts. This argument fails; the Army's decisions regarding implementation of housing programs for military families certainly involves legal and policy decisions that may fall within the ambit of the deliberative process privilege.

*Vaughn* index. Accordingly, the few Category A documents withheld solely pursuant to the deliberative process privilege will be reviewed *in camera*.

**B.**

Category B consists of correspondence and memoranda withheld pursuant to Exemption 5 that were not internal to the Army but instead sent between the Army and Clark. As previously discussed, documents withheld pursuant to Exemption 5 must be (i) inter-agency or intra-agency, and (ii) privileged. *See Rein*, 553 F.3d at 371. Although Category B documents were sent to or from Clark, they are privileged and properly withheld pursuant to the common interest doctrine, which operates in these circumstances to extend the meaning of inter-agency to include parties with interests common to the agency.

The common interest doctrine "permits parties whose legal interests coincide to share privileged materials with one another" in order to allow the parties to prosecute or defend their claims more effectively without impairing the privilege. *Hunton & Williams v. U.S. Dept. of Justice*, 590 F.3d 272, 277 (4th Cir. 2010). As a result, although Exemption 5 applies only to inter-agency or intra-agency memoranda or letters, "communications between a government agency and a party possessing common and unitary litigation interests should be understood as 'intra-agency' for purposes of Exemption 5." *Id.* at 277. In the words of the Fourth Circuit:

> It would eviscerate the meaning of Exemption 5 if we were to read it to exclude communications between federal agencies and their litigation partners where those communications advance an interest that is both common and, in the government's considered view, critical to the public's interest.

*Id.* at 279. Importantly, "common interest assertions by government agencies must be carefully scrutinized." *Id.* at 274. Thus, for the common interest doctrine to apply, an agency must demonstrate that, at the time of the communication in question, it had decided to support an

-22-

outside party in a legal matter, and that doing so was in the public interest. *Id.* In this matter, the

Army has demonstrated (i) that it shares a common interest with Clark in connection with the

Georgia state action and Clark's legal efforts to replace Pinnacle as property manager, and (ii)

that it has determined that replacing Pinnacle is in the public interest.

1.

The record demonstrates that on May 14, 2010, the Army determined that Clark's

decision to replace Pinnacle as property manager was in the public interest and approved Clark's

proposed course of action, namely removing Pinnacle and initiating the Georgia state action.

Specifically, the Buchholz Declaration provides that:

> The Army shared and shares a common interest with Clark in the ongoing
> litigation in Georgia state court, along with any other activity undertaken by Clark
> on behalf of a Residential Community Initiatives program housing LLC. This
> common interest derives generally from Army and Clark's pre-existing business
> relationship, in which Clark serves as the Manager of the Managing Member of
> housing LLCs that provide housing for Army personnel, and through which Clark
> has an obligation to protect those housing LLCs' interests, through litigation if
> necessary.
>
> More specifically, the common interest derives from the decision of Mr. Calcara,
> the Deputy Assistant Secretary of the Army (Installations, Housing and
> Partnerships), to agree with, and approve, Clark's proposed course of action in
> initiating litigation to that end that, among other things, seeks a declaration that
> Pinnacle's Property Management Agreements at Fort Benning and Fort Belvoir
> have been terminated automatically for cause. Mr. Calcara agreed to Clark's
> initiating the litigation after being presented with the confidential information at a
> briefing on May 14, 2010. Although not reduced to writing, the Army and Clark
> effectively formed a common interest on May 14 when the Army approved
> Clark's course of action. The actions Clark has taken benefit Soldiers, and thus
> they are in the Army's interest.

Buchholz Declaration ¶¶ 54-55. The Calcara Declaration further provides:

> As an investor/minority owner in the Projects, the Army has a clear interest in
> both the manner in which the litigation with Pinnacle is conducted and how the
> litigation is resolved. The Army's interest is common to that of the other Project
> owners/investors since every dollar spent on litigation expenses either reduces the
> amount of project net income that is available to recapitalize the Projects' housing

-23-

stock or increases the likelihood that the Projects will recover some or all of the monetary damages suffered by the Projects because of fraudulent activities perpetrated against the Projects by Pinnacle employees. In short, the Army would not have approved Clark's request to engage in the state court litigation if it did not feel that a successful litigation outcome would benefit the respective Projects, [the Army's Residential Communities Initiative Program], and in turn, the Army.

Calcara Declaration ¶ 8. These sworn statements clearly establish that, at the time of the Category B communications, the Army had decided to support Clark in its legal efforts to remove Pinnacle, and that Pinnacle's removal was in the public interest.

Seeking to avoid this conclusion, Pinnacle first argues that the common interest doctrine cannot apply because there was no written agreement and because the Army is not a party in the Georgia state action. Yet, the Fourth Circuit has made clear that neither a written agreement nor participation in litigation are requirements for invocation of the common interest doctrine. As the Fourth Circuit put it, "The common interest doctrine requires a meeting of the minds, but it does not require that the agreement be reduced to writing or that litigation actually have commenced." *Hunton & Williams*, 590 F.3d at 287. Additionally, the Fourth Circuit has found the common interest doctrine applied where only one entity was a named party in the relevant civil litigation. *See In re Grand Jury Subpoenas, 89-3 and 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990). In any event, although the Army is not a named party in the Georgia state action, it is a 49% owner of one of the plaintiffs, and thus clearly can be considered a party in interest with respect to that litigation.

Pinnacle next attacks as excessively broad Buchholz's statement that the Army shares a common interest in the litigation "along with any other activity undertaken by Clark on behalf of [FBFC or FBRC]." Buchholz Declaration ¶ 54. Pinnacle argues this broad expression of interest is not specific enough to support the application of the common interest doctrine. This attack fails because the Army does not rely solely on the broad language, as Buchholz goes on to focus

-24-

the scope of the common interest to Clark's actions to replace Pinnacle through the Georgia state action. *See* Buchholz Declaration ¶ 55. Calcara provides even further detail. Pinnacle seizes on Calcara's statement that the "Army's interest is common to that of the other Project owners/investors," arguing that since Pinnacle is an owner/investor in Clark Pinnacle Benning, the Army shares an interest with Pinnacle as well as with Clark. This argument fails to persuade; there is no question that the Army's interest in the Georgia state action is aligned with Clark's and opposed to Pinnacle's: the focus of the action, initiated by Clark and approved by the Army, is to remove Pinnacle for alleged fraud and mismanagement. *See* Buchholz Declaration ¶ 55.[12]

Along similar lines, Pinnacle argues that the Army's contractually-obligated consent does not amount to a determination that it has a "common and unitary" interest with Clark or that there is a public interest in removing Pinnacle. In essence, Pinnacle argues that neither the Army nor the public has a "dog in the fight" between Pinnacle and Clark. According to Pinnacle, Clark's effort to remove Pinnacle is not actually about the alleged wrongdoing but rather an attempt to usurp Pinnacle's share of the profits. As a result, Pinnacle argues that if Pinnacle prevails in the Georgia state action by demonstrating that it did not engage in any fraud or mismanagement, then the Army and the public interest are served by exposing Clark's misrepresentations.

---

[12] Pinnacle also argues that Calcara "carefully avoids... confirming, or even addressing in any manner" Buchholz's statement that Calcara agreed to initiate the litigation. Yet Calcara confirms that the Buchholz Declaration "accurately describes both the relationship between the Army and Clark and the Army's interests regarding the relevant state court litigations." Calcara Declaration ¶ 2. Calcara also provides further detail about the Army's decision to approve, specifically about the Army's contractual right to approve litigation, ¶ 4, the Clark-provided information that assisted the Army, ¶ 7, the Army's contractual right to continue to approve the costs of litigation, ¶ 6, and the Army's reasons for its decision, ¶ 8. If Pinnacle's objection is that Calcara spoke of the Army's approval rather than his personal approval, then this objection fails as well. Given Calcara's position as the Army's representative, it is entirely appropriate that he discusses the approval as the Army's approval rather than his personal approval.

This argument also fails to persuade.  Pinnacle's opinion about what is in the Army's or in the public interest is irrelevant.   What is relevant is the Army's determination, clearly demonstrated in this record, that based on the evidence Clark adduced, supporting Clark in its legal effort to replace Pinnacle is in the Army's and thus in the public interest.   While this determination arose in the context of the Army's contractually-required consent, it is apparent that this consent was not merely the Army's indifferent permission for Clark and Pinnacle to wrangle over profits.  Rather, the Army determined replacing Pinnacle is in the interest of the soldiers, the Army, and thus, the public.  *See* Calcara Declaration ¶ 8. Buchholz Declaration ¶ 55.  Importantly, the Fourth Circuit has held that even if Clark is motivated by profits, while the Army is motivated by the public interest, they still share a "common and unitary" interest if they both seek the same result, in this case success in the Georgia state action and removal of Pinnacle as property manager at Fort Benning and Fort Belvoir.  *See Hunton & Williams*, 590 F.3d at 282.[13]

Pinnacle, indefatigable in its advocacy, next argues that the only public interest identified is the Army's financial interest, which is not sufficient for purposes of the common interest doctrine.  This, too, fails.  First, it is entirely appropriate for the Army's financial interest to be the basis of the common interest doctrine.[14]  Even if this were not appropriate, common sense

_____

[13] Pinnacle also points to accolades it has received for its management services from the Army, in part to argue that the Army could not have determined its termination was in the public interest.  This argument is not persuasive; it is certainly possible that some Pinnacle employees did praiseworthy work, while others committed the alleged wrongdoings.  Whether Pinnacle provided some praiseworthy services is not at issue; what is at issue is whether the Army, given the information it had, determined, as it did, that it was in the public interest for Clark to proceed with its proposed course of action with respect to the Fort Benning and Fort Belvoir projects.

[14] Although the parties dispute the extent of the Army's financial stake in the project, it is clear that the Army has made significant investments in both the Fort Benning and Fort Belvoir

and the entirety of the record reveal other interests as well, such as the importance both to soldiers' lives and the Army's reputation of having well-run family housing programs. The serious allegations of Pinnacle's fraud and mismanagement demonstrate precisely why the Army determined it was in the public interest to consent to both the Georgia state action and replacing Pinnacle as property manager. *See* Army Ex. 5 (detailing Pinnacle's alleged wrongdoing).

In addition, Pinnacle's reliance on *Department of Interior v. Klamath Water Users Protective Association* is misplaced. In *Klamath*, the Supreme Court held that Exemption 5 did not extend to self-interested lobbying by outside parties. *See Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 10-11 (2001). *Klamath*, which did not address the common interest doctrine, is distinguishable. In *Klamath*, the agency never decided what its interests were or embarked on a definite course of action. As the Fourth Circuit put it in *Hunton & Williams*, "*Klamath* addressed the case of self-interested parties attempting to persuade the government to adopt a particular policy, but those concerns are no longer in play once the government is actually persuaded that the policy is in the public interest." *Hunton & Williams*, 590 F.3d at 279. As a result, once an agency is "actually persuaded" that a particular legal action advocated by a private entity is in the public interest, then Exemption 5 may apply. *Id.* Appropriately, the Army does not seek to apply Exemption 5 to communications prior to its May 14, 2010 decision to agree with Clark's proposed course of action, but only those communications after it was actually persuaded that course of action was in its interest. In sum, the Army has adduced sufficient evidence to demonstrate that it shares a common and unitary legal interest with Clark in the success of FBFC, owned 49% by the Army, and FBRC in the Georgia state action and in the replacement of Pinnacle as property manager.

---

housing projects and that the Army has an interest in the projects being well-run and financially stable.

**2.**

The common interest doctrine satisfies only the inter-agency or intra-agency requirement of Exemption 5; it does not satisfy the second requirement, namely that the withheld documents be privileged. *See Hunton & Williams*, 590 F.3d at 280. Thus, in addition to meeting the requirements of the common interest doctrine, the Army must also demonstrate that Category B documents are subject to the attorney-client or deliberative process privilege. The Army has invoked the attorney-client privilege for all Category B documents, and the deliberative process privilege for all Category B documents but one. Because the Army has met its burden in demonstrating that all Category B documents are properly withheld pursuant to the attorney-client privilege, the application of the deliberative process privilege to Category B documents need not be reached.

In addition to arguing – unpersuasively – that there is no common interest between the Army and Clark, which is addressed, *supra*, Pinnacle's sole argument with respect to the Army's invocation of the attorney-client privilege for Category B documents is that even if there were a common interest, the attorney-client privilege cannot apply to correspondence and memoranda sent between Army personnel and Clark attorneys, or *vice-versa*, because there is no attorney-client relationship. This argument fails; the core of the common interest doctrine is that it extends privileges, such as the attorney-client privilege, to encompass communications with third parties. *See U.S. v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996) (common interest doctrine is "an extension of the attorney-client privilege"). As the Fourth Circuit has explained, "The purpose of the privilege is to allow persons with a common interest to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims."

*In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005) (quotations marks and citations omitted).

As with those Category A documents withheld pursuant to the attorney-client privilege, the Army must demonstrate the confidential nature of the information contained in Category B documents withheld pursuant to the attorney-client privilege, pursuant to either an express or an implied grant of confidentiality, and the Army must demonstrate that the privilege was not waived by disclosure to a third party, who does not share in the common interest. *Rein*, 553 F.3d at 375. As previously discussed, the attorney-client privilege "is not limited to communications made in the context of litigation or even a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter," and encompasses both the giving of professional advice by a lawyer and the giving of information to the lawyer for the purposes of obtaining such advice. *Id.*

To meet its burden in this regard, the Army provides the Buchholz Declaration and the *Vaughn* index. The *Vaughn* index identifies all Category B documents withheld pursuant to the attorney-client privilege, as well as the parties to the communication, date, and mode of communication. Together, the *Vaughn* index and Buchholz Declaration provide the subject-matter of the communications and that the subject-matter is confidential. As a result, the Army has identified the documents in question with reasonable specificity, as required for an independent assessment of the claimed exemption, and there is no reason to question the Army's good faith in this regard. In any event, Pinnacle does not object to the sufficiency of the Army's descriptions of the documents but rather solely objects – unsuccessfully – to the Army's legal contention that Exemption 5 applies to the documents described. Pinnacle's objection fails, and

the Army has demonstrated that Category B documents are properly withheld pursuant to the attorney-client privilege.

## C.

Category C consists of documents withheld pursuant to Exemption 4, which permits an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Most Category C documents were provided to the Army by Clark in a binder on or about May 6, 2010. Clark had requested a meeting to obtain the Army's approval to replace Pinnacle as property manager and to commence the Georgia state action. Clark, at the meeting, provided the binder to the Army to demonstrate the soundness of its proposed course of action. The binder was prepared by Clark's outside counsel, Kirkland & Ellis, and contained over five hundred pages of documents, organized into thirty-five tabs, relating to Pinnacle's provision of property management services and the proposed litigation. Following the meeting, the Army, based in part on a review of the materials provided, approved Clark's proposed course of action to replace Pinnacle and commence the Georgia state action. *See* Buchholz Declaration ¶¶ 45-47; Calcara Declaration ¶ 7; Brody Declaration I ¶ 2.

The Army initially released some materials from the binder, namely operating and project management agreements. Nevertheless, most documents were withheld pursuant to Exemption 4. The Army's *Vaughn* index provides detailed information about each of the documents withheld, permitting an independent evaluation of the application of Exemption 4. These documents include timelines and tables created at the direction of Clark's outside counsel that relate to Pinnacle's alleged wrongdoing, notes taken during interviews with personnel relating to the allegations of misconduct, and internal reports detailing the alleged wrongdoing and

evaluating the project's internal financial controls.  Other documents in the binder that were selected and organized by Clark's outside counsel from a larger universe of documents include selected emails, invoices, invoice logs, checks, and work orders.

In addition to the documents in the binder, the Army invokes Exemption 4 to withhold legal memoranda prepared by Clark and Clark's outside counsel and submitted to the Army after Clark provided the Army with the binder.  The memoranda discuss the findings from Clark's investigation into Pinnacle's property management services at Fort Benning and Fort Belvoir.[15] Those memoranda written after the Georgia state action commenced also include litigation summaries.[16]

Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  The Army does not contend that Category C documents contain trade secrets.  In order to bring information – other than trade secrets – within Exemption 4, "it must be shown that the information is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Nat'l Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 766 (D.C. Cir. 1974).  It is undisputed that the information in question is "commercial or financial" and "obtained from a person."  Thus, the only issue is whether the information is "privileged or

---

[15] To the extent that Pinnacle attacks the Army's descriptions of documents as including results of an "audit" rather than results of a "forensic investigation" into Pinnacle's management services, this argument fails to persuade.  There is no doubt that there was an investigation into Pinnacle's alleged wrongdoing and that the results were included in the information provided to the Army.  What the Army calls that investigation is not material to this analysis under FOIA.

[16] Memoranda sent to the Army after May 14, 2010, when the Army determined it had a common interest with Clark with respect to the Georgia state action and replacement of Pinnacle as property manager at Fort Benning and Fort Belvoir, are also withheld pursuant to Exemption 5.  As previously discussed, the Army has met its burden in demonstrating that these documents are exempt from disclosure under to Exemption 5. *See* Section IV(B), *supra*.

confidential." *Id.* Because Category C documents are properly considered confidential, *see infra*, the issue of whether or not they are privileged within the meaning of Exemption 4 is not reached or decided.

As a preliminary matter, it is necessary to ascertain the proper test for determining whether a document is "confidential" under Exemption 4. In *Acumenics Research & Technology v. U.S. Dept. of Justice*, 843 F.2d 800 (4th Cir. 1988), the Fourth Circuit endorsed the test developed by the D.C. Circuit in *National Parks*, which provides that documents are "confidential" if "disclosure is likely to (1) 'impair the [g]overnment's ability to obtain necessary information in the future,' or (2) 'cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Id.* at 807 (*quoting National Parks*, 498 F.2d at 770). In *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992), the D.C. Circuit modified the *National Parks* test, holding that where, as here, information is submitted voluntarily, it is "confidential" if it is "of a kind that would customarily not be released to the public by the person from whom it was obtained." *Id.* at 879. The Fourth Circuit has not yet determined whether to adopt the *Critical Mass* modification to the *National Parks* test. *See Wickwire Gavin*, 356 F.3d at 597 ("[W]e do not need to reach the issue of Exemption 4's applicability to this data. Thus, we do not decide which test governs within the Fourth Circuit for determining whether information is confidential."). Because Category C documents satisfy the tests for confidentiality under both the *National Parks* and *Critical Mass* standards, it is unnecessary to reach or decide which test is required in the Fourth Circuit. Each test is addressed separately below.

In order to invoke the *Critical Mass* test, the information the agency seeks to withhold must have been submitted voluntarily. A submission is voluntary if "no legal penalty

accompanies [a] failure to cooperate." *Comdisco*, 864 F.Supp. at 517 n. 7. In other words, a submission is mandatory only where an agency has the legal authority to require it. *See Center for Auto Safety v. National Highway Traffic Safety Admin.*, 244 F.3d 144, 148-149 (D.C. Cir. 2001); *see also Parker v. Bureau of Land Management*, 141 F.Supp.2d 71, 78 n. 6 (D.D.C. 2001) ("In addition to possessing the authority to compel submission, the agency must also exercise that authority in order for a submission to be deemed mandatory."). While the Army's consent to Clark's proposed actions may be contractually required, there is no regulation or contractual provision requiring any written submission by Clark to obtain that consent, let alone a submission of hundreds of pages of analysis and evidence. Clark could have chosen to brief the Army orally or to provide far less documentation. As a result, it is clear that Category C documents were submitted voluntarily to the Army and thus satisfy this prerequisite to the *Critical Mass* test.

Under the *Critical Mass* test, voluntarily-submitted documents are considered "confidential" if they are "of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass*, 975 F.2d at 879. Category C documents clearly satisfy this standard. These documents contain confidential findings of Clark's investigation into Pinnacle and elements of FBFC and FBRC's business and financial information. In addition, Category C documents constitute attorney work product. Many memoranda, tables and timelines were created by or at the direction of Clark's outside counsel in anticipation of litigation. In addition, the other materials in the binder, such as invoices, emails, and internal reports, were selected and organized by Clark's outside counsel in anticipation of litigation and, as a result, their selection and organization reflects the thought processes, theories and specific preparation of Clark's outside counsel in anticipation of the Georgia state action,

thus constituting work product.[17]  Some of the documents that were used in the binder may be discoverable in the Georgia state action or may even already be in Pinnacle's possession, but even those documents are confidential work product because, as a result of their selection and inclusion in the binder, they reflect what Clark's outside counsel believed most relevant with respect to the anticipated litigation.[18]

Pinnacle contends the documents at issue would be customarily released to the public because Clark has publicly professed that it has sufficient cause to terminate Pinnacle and "[t]hat the details underlying its arguments are not yet disclosed is of no instance: it has already made the subject a matter of public interest." *See* Pinnacle Br. (Doc. 22), 15 n. 10.  Although Clark has put the broad issue of Pinnacle's alleged fraud and mismanagement into the public forum, this certainly does not mean Clark would customarily release its attorneys' analyses and compilation of evidence to the public.  While Clark was willing to share its work product with the Army, a 49% owner of one of the plaintiffs in the Georgia state action, common sense

---

[17] *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (work product includes assembling information and sifting relevant from irrelevant facts); *In re Allen*, 106 F.3d 582, 608 (4th Cir. 1997) (employment records chosen and arranged by an attorney in anticipation of litigation constitute opinion work product because "selection and compilation of these particular documents reveals [attorney's] thought processes and theories regarding the litigation"); *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1329 (8th Cir. 1986) ("In cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research."); *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) ("We believe that the selection and compilation of documents in this case in preparation for pretrial discovery falls within the highly-protected category of opinion work product.").

[18] At oral argument, Pinnacle suggested that the binder itself may be discoverable if used to prepare for a deposition. *See* Rule 612, Fed.R.Evid.  This argument does not apply, as there is no evidence the binder was used in that manner.  It is true that work product may be discoverable in certain circumstances, including where there is a showing of substantial need with respect to fact work product or even in rare and extraordinary circumstances with respect to opinion work product.  *See Nutramax Laboratories, Inc. v. Twin Laboratories Inc.*, 183 F.R.D. 458, 462-463 (D. Md. 1998).  But the fact that there may be circumstances in litigation where work product may be discoverable based on an adversary's need is not relevant to the confidentiality analysis under FOIA.

dictates, and Clark's corporate counsel confirms, that Clark would not customarily release such sensitive information to the general public, which includes Clark's adversary, Pinnacle. *See* Brody Declaration I, ¶ 5. As previously noted, Clark withheld these same materials in civil discovery in the Georgia state action. *See* Army Ex. 11, Army Ex. 12. In sum, the *Critical Mass* test is met – the information in Category C documents is "of a kind that would customarily not be released to the public" – and thus Category C documents are properly considered confidential under the *Critical Mass* standard. *Critical Mass*, 975 F.2d at 879.

In this instance, the application of the *National Parks* test leads to the same result. Under *National Parks*, documents are "confidential" where disclosure is likely (i) "to impair the [g]overnment's ability to obtain necessary information in the future," or (ii) "to cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks*, 498 F.2d at 770. Since the Army does not argue there would be harm to Clark's competitive position, only the impairment prong is at issue.

The *Critical Mass* test and the *National Parks* test often, as they do here, lead to the same result. This is so because where, as here, the voluntary submission of information that would not customarily be released to the general public satisfies the *Critical Mass* test for confidentiality, so also disclosure of that information would impair the government's ability to obtain it in the future, thereby satisfying the *National Parks* test for confidentiality. *Comdisco*, 864 F.Supp. at 517-518 (pointing out that the *National Parks* test and the *Critical Mass* test often lead to the same result).

While the impairment prong of *National Parks* may generally be met where, as here, an individual submits information voluntarily that would not customarily be released to the general public, in some situations, there are "sufficient external incentives" for an individual to submit

information that is not customarily released even though the submitter knows that information could become publicly available. *Comdisco*, 864 F.Supp. at 518 n. 9. Here, the record persuasively shows that no such "sufficient external incentives" exist for Clark to provide the Army with such thorough and extensive analyses and evidence in the future if this material is disclosed to the general public and Clark's adversary, Pinnacle. To be sure, Clark had an incentive to provide the Army with some information for the purpose of obtaining its consent. Importantly, however, it is entirely for Clark to determine how much information to provide the Army, what form the information should take, and how detailed it should be. Thus, it is entirely within Clark's discretion whether to provide information orally or to provide, as it did, a substantial amount of written material detailing the results of an investigation into Pinnacle's management services and including analyses and evidence gathered by Clark's outside counsel in anticipation of litigation.[19] Common sense points persuasively to the conclusion, confirmed in the Army's declarations, that information of this quantity and nature would not be supplied in the future if it were to be revealed to the general public and Clark's adversary in litigation at their request.[20]

Although not discussed by Pinnacle, some courts have found "sufficient external incentives" for a government contractor to submit pricing information as part of a contract bid despite the risk of disclosure because disclosure of such information is merely the "cost of doing

---

[19] To the extent that Pinnacle argues that not all this information was "necessary", this argument fails. "Necessary" does not mean absolutely essential but rather helpful to the agency in carrying out its mandate or in making intelligent, well-informed decisions. *See 9 to 5 Org. for Women Office Workers v. Board of Governors of Fed. Reserve System*, 721 F.2d 1, 10 (1st Cir. 1983); *National Parks*, 498 F.2d at 767. There is no question that all of the information Clark submitted to the Army meets that standard.

[20] While not entitled to deference, the Army declarations are consistent with this common sense conclusion. *See* Buchholz Declaration ¶¶ 48-50; Calcara Declaration ¶ 5.

business with the government" and the financial rewards for contractors ensure continued government access to the price information. *See Racal-Milgo Government Systems, Inc. v. Small Business Admin.*, 559 F. Supp. 4, 5-6 (D.D.C. 1981); *Center for Public Integrity v. Dep't of Energy*, 191 F. Supp. 2d 187, 195-196 (D.D.C. 2002). These cases are distinguishable. Unlike those matters, where businesses were required to provide price information in order to bid for a contract, Clark already has a long-term contract with the Army. More importantly, even if, as Pinnacle argues, Clark will benefit financially from the litigation and Pinnacle's termination, unlike where a company submits prices as part of a contract bid, Clark had the discretion to provide far less detailed information than the analyses and evidence that it did submit to obtain the Army's consent.

More apposite here than the cases that discuss disclosure of prices in the bidding context are those cases where courts have found disclosure would impair the government's ability to obtain necessary information in the future because of the detailed and sensitive nature of the information in question, such as where, as here, the information was legal analyses regarding whether to commence litigation or documents that revealed an attorney's thought processes and strategy,[21] or where government contractors provided information that was more detailed and sensitive than merely prices.[22] Thus, under *National Parks*, as well as *Critical Mass*, Category C documents are properly considered confidential.[23]

---

[21] *See Miller, Anderson, Nash, Yerke & Wiener v. United States Dep't of Energy*, 499 F.Supp. 767, 771-772 (D.Or. 1980); *Indian Law Resource Center v. Dep't of the Interior*, 477 F.Supp. 144, 148 (D.D.C. 1979).

[22] *See, e.g., Orion Research Inc. v. Environmental Protection Agency*, 615 F.2d 551, 554 (1st Cir. 1980) (technical proposal for development of a system to analyze gases generated by petroleum refineries was considered confidential); *Landfair v. U.S. Dept. of Army*, 645 F.Supp. 325, 327-328 (D.D.C. 1986) (price and design information that required substantial investment of time and resources was considered confidential); *Timken Co. v. United States Customs Serv.*,

Next, Pinnacle contends disclosure here is in the public interest because Category C documents are a part of a lobbying campaign by Clark to convince the Army to engage in a particular course of action and, as such, should be revealed to the light of day. Pinnacle is correct that there is a public interest in what evidence Clark has against Pinnacle and whether Pinnacle committed the alleged wrongdoing, but that public interest is already served and vindicated in the Georgia state action. There, Clark must reveal its evidence against Pinnacle, both in discovery and in meeting its burden on the merits. Pinnacle may challenge the veracity of Clark's claims and defend its company's reputation in that forum. While the public does have an interest in the truth behind Clark's allegations, in this FOIA action, the dispositive public interest with respect to Category C documents is ensuring that entities like Clark continue to provide high quality, confidential materials to the Army in the future, so that the Army is alerted to the potential wrongdoing of its contractors and thus able to reach well-informed decisions regarding the proper course of action in such situations.

## V.

Finally, Pinnacle argues in a single footnote sentence that the Army has not reasonably segregated releasable information. Pinnacle provides no further detail as to what specifically it objects to or any rationale for this conclusory statement. *See* Pinnacle Br. (Doc. 22), 14 n. 9. It

---

491 F.Supp. 557, 561 (D.D.C. 1980) (results of an investigation conducted to determine the foreign value of particular product was considered confidential); *Audio Technical Services v. Department of the Army*, 487 F.Supp. 779, 781-782 (D.D.C. 1980) (customer list, design recommendations and concepts, and biographical data on key employees provided as part of a contract bid was considered confidential).

[23] Notably, even where submissions are mandatory, it may be appropriate to prevent disclosure "for fear that the quality of information provided will deteriorate if disclosure of the submission is required." *Comdisco*, 864 F.Supp. at 518 n. 9. Even if Clark were required to submit some written information, the risk that it would provide far less or far less detailed information would be sufficient to justify withholding.

is true that the Army has the burden of demonstrating that no reasonably segregable information exists in the withheld documents. *See Ethyl Corp.*, 25 F.3d at 1250; 5 U.S.C. § 552(b). On this record, the Army has met its burden.

In its declarations and *Vaughn* index, the Army has demonstrated with reasonable specificity that the withheld documents include no reasonably segregable information beyond that already released, and there is no reason to question the Army's good faith in this regard. *See Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (agencies entitled to presumption they complied with obligation to disclose reasonably segregable material); *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996) (where government declarations demonstrate with reasonable specificity why documents cannot be further segregated, there is no need for *in camera* review).

The Army conducted a page-by-page review of each document to evaluate whether there was any segregable information, and where it determined that it could not release factual information within a document, it provided specific reasons. In this regard, the *Vaughn* index includes an individual segregability finding for each document, and where necessary, an accompanying rationale. For example, the Army noted that in some instances, the author presented the facts in a manner that suggested the author's subjective assessment or the author distilled the facts from a larger set of facts, thus revealing the Army's deliberative process or confidential attorney-client communications. *See* Buchholz Declaration ¶¶ 64-65.

For many Army-generated documents, the Army concluded that there was no segregable information because, after applying the exemptions, only essentially meaningless words and phrases remained. The Army is under no obligation "to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together

-39-

have minimal or no information content." *Mead Data Central, Inc. v. U.S. Dept. of Air Force*, 566 F.2d 242, 261 n. 55 (D.C. Cir. 1977). The Army nonetheless offered to provide, and later did provide, this "essentially meaningless" information to Pinnacle.

With respect to the Clark-submitted documents, the Army segregated and released certain documents that were not confidential, including cover sheets that contained no confidential information, operating agreements, the Fort Benning property management agreement, and Pinnacle personnel documents that, once individuals' names were redacted, contained no information that revealed the thought processes of Clark's outside counsel in selecting those particular documents.[24] Since counsel's thought processes and legal strategy are revealed by which documents were selected for the binder, information revealing the specific identify of documents may be withheld, resulting in most Clark-submitted documents being withheld in their entirety.

Notably, Pinnacle does not object to the legal soundness of the Army's explanations regarding its segregability analysis. The Army has met its burden with respect to the segregability of the records, but nonetheless, the *in camera* review of those documents withheld solely pursuant to the deliberative process privilege will permit independent confirmation of the Army's segregability determinations with respect to those documents.

## VI.

For the foregoing reasons, the Army's motion for summary judgment is granted in part and deferred in part, pending *in camera* review of those documents withheld solely pursuant to

---

[24] The Army originally withheld some Pinnacle personnel documents, but these documents, as well as a Pinnacle purchasing memorandum, were later released. *See American Management Services, LLC d/b/a Pinnacle v. Department of the Army*, Case No. 11cv442 (E.D.Va. Dec. 6, 2011) (Doc. 39).

-40-

the deliberative process privilege.[25]   Accordingly, Pinnacle's motion for summary judgment is

denied in part and deferred in part.

An appropriate Order will issue.

Alexandria, Virginia
January 23, 2012

T. S. Ellis, III
United States District Judge

---

[25] These documents bear Bates numbers 221, 221-225, 293-295, 296, 298, 298, 298-299, 319-320, 382, 382-383.   There are also Exemption 6 redactions on these documents, but those redactions are not in dispute.