PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMERICAN MANAGEMENT SERVICES,
LLC, d/b/a Pinnacle,

*Plaintiff-Appellant,*

v.

DEPARTMENT OF THE ARMY,

*Defendant-Appellee.*

No. 12-1274

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:11-cv-00442-TSE-TCB)

Argued: October 23, 2012

Decided: January 9, 2013

Before TRAXLER, Chief Judge, and WYNN and
THACKER, Circuit Judges.

───────────────────────────────

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Wynn and Judge Thacker joined.

───────────────────────────────

## COUNSEL

**ARGUED:** C. Allen Foster, GREENBERG TRAURIG, LLP,
Washington, D.C., for Appellant. Julie Ann Edelstein,
OFFICE OF THE UNITED STATES ATTORNEY, Alexan-

dria, Virginia, for Appellee. **ON BRIEF:** Joe R. Reeder, Eric C. Rowe, GREENBERG TRAURIG, LLP, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

---

## OPINION

TRAXLER, Chief Judge:

This dispute focuses on communications between Clark Realty Capital, LLC ("Clark") and the Department of the Army ("Army"). The appellant, American Management Services, LLC, d/b/a Pinnacle ("Pinnacle"), claims that the Army unlawfully withheld many of these communications in violation of the Freedom of Information Act ("FOIA"). The district court granted summary judgment to the Army, and Pinnacle appeals from that judgment. For the reasons that follow, we affirm.

I.

Acting under the authority granted to it by the Military Housing Privatization Initiative, *see* 10 U.S.C. §§ 2871-2885, the Army has privatized family housing at several Army installations, including Fort Benning in Georgia and Fort Belvoir in Virginia. To effect this privatization, according to the parties, the Army sought bids from the private sector to develop, own, operate, manage, and maintain family housing. At both Fort Benning and Fort Belvoir, Clark teamed up with Pinnacle to compete for the housing projects.

At Fort Benning, Clark and Pinnacle formed Clark Pinnacle Benning, LLC ("CPBenning"). Clark owned 70% of CPBenning and served as its managing member. Pinnacle owned the remaining 30% of CPBenning. Once CPBenning was awarded the housing project, CPBenning and the Army formed Fort

Benning Family Communities, LLC ("FBFC"), with CPBenning owning 51% of FBFC and the Army owning the remaining 49%. Clark served as the managing member of FBFC. American Management Services East, LLC ("AMSE"), a subsidiary of Pinnacle, served as the property manager for FBFC.

The arrangement at Fort Belvoir was slightly different and more complicated. Clark and Pinnacle initially formed two entities: Clark Pinnacle Belvoir, LLC ("CPBelvoir") and Belvoir Holdings, LLC. These two entities, owned 70% by Clark and 30% by Pinnacle, then formed Fort Belvoir Residential Communities, LLC ("FBRC"). Clark served as the managing member for FBRC, and AMSE served as its property manager.[1] The Army did not own any part of FBRC; however, Belvoir Land, LLC, an entity owned 49% by the Army and 51% by CPBelvoir, leased land to FBRC for the development of housing.

## II.

In 2010, Clark contends it discovered evidence of alleged fraud being committed by Pinnacle.[2] As a result, by May 2010, Clark had decided to appoint a replacement property manager for both FBFC and FBRC and to initiate litigation against Pinnacle. In order for FBFC and FBRC to appoint a replacement property manager and to initiate litigation, however, Clark was obligated by the companies' operating agreements to obtain the Army's approval. Clark met with the Army on May 6, 2010, and provided the Army with a binder of documents prepared by Clark's outside counsel, Kirkland & Ellis. The documents contained in the binder were meant to provide the Army with evidence of the fraudulent conduct

---

[1] Although AMSE, and not Pinnacle, was the actual property manager, we will hereinafter refer to AMSE as Pinnacle for the sake of simplicity.

[2] Pinnacle disputes that it was acting fraudulently. We do not address whether Pinnacle was in fact acting fraudulently, and we mention the alleged fraud for background purposes only.

that Clark alleged. After viewing these documents, the Army, on May 14, 2010, approved of Clark's proposed course of action. Six days later, Clark, on behalf of FBFC and FBRC, filed a lawsuit against Pinnacle in the Superior Court of Muscogee County, Georgia (the "Georgia litigation"), seeking, among other things, a declaratory judgment that the property management agreements at Forts Benning and Belvoir were automatically terminated as a result of Pinnacle's alleged misconduct. The Army is not a party to the Georgia litigation. However, after the Army gave its approval to Clark, and during the pendency of the Georgia litigation, which is ongoing, Clark and the Army continued to correspond about the litigation and about the management of the military housing projects generally.

Through the discovery process in the Georgia litigation, Pinnacle sought the binder provided to the Army by Clark and various other communications between Clark and FBFC/FBRC. FBFC and FBRC objected to the discovery requests, asserting various privileges. Instead of moving to compel disclosure of these documents or challenging the validity of the assertions of privilege, Pinnacle submitted a FOIA request to the Army. In that request, Pinnacle sought, among other things, "[a]ll records of any nature referring directly to pending litigation or matters known to be directly related to" the Georgia litigation and "[a]ll records submitted or requested by Clark." J.A. 344. On February 24, 2011, a government official provided Pinnacle with an interim release of 48 documents. Believing that this interim release was unresponsive to its FOIA request and that the Army had violated FOIA by failing to timely respond to its request, Pinnacle filed the instant FOIA action in the Eastern District of Virginia. In its complaint, Pinnacle sought a declaration that the Army had violated FOIA and sought an order compelling the Army to produce all responsive records and provide Pinnacle with an index of all responsive documents, pursuant to *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973) (requiring agencies to correlate documents withheld with a

specific FOIA exemption and the agency's nondisclosure justification).

On May 20, 2011, the Army issued its final administrative decision on Pinnacle's FOIA request. In that decision, the Army acknowledged that 929 pages of responsive documents remained after accounting for the interim release of 48 pages. Of the 929 pages of responsive documents, the Army released 7 pages, withheld 383 pages claiming they were either in Pinnacle's possession already or contained only boilerplate language,[3] and withheld the remaining 344 pages based on Exemptions 4 and 5 of FOIA. *See* 5 U.S.C. § 552(b)(4), (5). Subsequent to this administrative release, the Army answered Pinnacle's complaint, filed a motion for summary judgment, and attached a *Vaughn* index to the motion. Pinnacle opposed the Army's motion and filed a cross-motion for summary judgment.

In addressing these motions, the district court first grouped the documents at issue into three separate categories, an organizational approach that we will follow. Category A contained correspondence and memoranda internal to the Army; Category B contained correspondence between the Army and Clark or between the Army and Clark's outside counsel; and Category C contained documents submitted by Clark to the Army. The district court found that the Category A and B documents fell within Exemption 5 of FOIA, *see* 5 U.S.C. § 552(b)(5), and that the Category C documents fell within Exemption 4 of the statute, *see id.* § 552(b)(4). The district court, therefore, denied Pinnacle's motion and granted the Army's motion. Pinnacle now appeals from that grant of summary judgment.

---

[3]The Army nonetheless expressed its willingness to make these 383 pages available, subject to standard duplication fees.

### III.

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Accordingly, under FOIA, when "any person" makes a sufficiently specific and reasonable request for records from a government agency, the agency "shall make the records promptly available." 5 U.S.C. § 552(a)(3)(A). However, because "public disclosure is not always in the public interest," *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982), the statute contains nine exemptions that "reflect a wide array of concerns," *Hunton & Williams v. DOJ*, 590 F.3d 272, 277 (4th Cir. 2010), and "are designed to safeguard various public interests against the harms that would arise from overbroad disclosure," *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 290 (4th Cir. 2004).

"FOIA exemptions are to be narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630 (1982). The government has "[t]he burden of demonstrating that a requested document falls under an exemption," *Hunton & Williams*, 590 F.3d at 276, which it can satisfy "by describing the withheld material with reasonable specificity and explaining how it falls under one of the enumerated exemptions," *Hanson*, 372 F.3d at 290. Whether a document falls within a prescribed exemption, and therefore whether a district court properly granted the government summary judgment, is a question of law that we review de novo. *See Ethyl Corp. v. EPA*, 25 F.3d 1241, 1246 (4th Cir. 1994).

On appeal, Pinnacle challenges the district court's ruling with respect to the documents in Categories B and C only.[4]

---

[4]Pinnacle does not challenge on appeal the district court's grant of summary judgment with respect to the Category A documents. Before the district court, Pinnacle also objected to the Army's declarations, the adequacy

Following the order in which the parties have raised these issues in their briefing, we begin by addressing the Category C documents.

## A.

The bulk of the Category C documents were prepared by Clark's outside counsel and were contained in the binder Clark gave to the Army when seeking its approval to appoint a replacement property manager and to initiate litigation.[5] The district court concluded that the Category C documents fell within Exemption 4, which provides that FOIA "does not apply to matters that are . . . (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). To establish that Exemption 4 applies, the government must therefore show that the documents at issue are (1) trade secrets or commercial or financial information, (2) that were obtained from a person outside the government, and (3) are privileged or confidential. *Acumenics Research & Tech. v. DOJ*, 843 F.2d 800, 807 (4th Cir. 1988). Pinnacle concedes that the Army can satisfy the

---

of the Army's search for responsive documents, and the accuracy of the Army's *Vaughn* index. Pinnacle also argued before the district court that the Army did not reasonably segregate releasable information. The district court found these four contentions to be without merit, and Pinnacle has not raised them on appeal.

[5]According to the district court,

> [t]hese documents include timelines and tables created at the direction of Clark's outside counsel that relate to Pinnacle's alleged wrongdoing, notes taken during interviews with personnel relating to the allegations of misconduct, and internal reports detailing the alleged wrongdoing and evaluating the project's internal financial controls. Other documents in the binder that were selected and organized by Clark's outside counsel from a larger universe of documents include selected emails, invoices, invoice logs, checks, and work orders.

J.A. 837-38.

first two elements of this test because the Category C documents were commercial in nature and were obtained from a person outside of the government. The only question, then, is whether the Category C documents are privileged or confidential.

Pinnacle and the Army focus their Category C arguments on confidentiality and give short shrift to the issue of privilege, mentioning the issue mostly in footnotes in their briefs. And the district court, upon finding the Category C documents to be confidential, did not reach the issue of privilege. Because we agree that the documents are confidential, we likewise do not address the question of privilege.

Adopting a test formulated by the D.C. Circuit in *National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) (the "*National Parks* Test"), we have held that "[i]nformation is confidential if its disclosure is likely to (1) 'impair the Government's ability to obtain necessary information in the future,' or (2) 'cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Acumenics Research & Tech.*, 843 F.2d at 807 (quoting *Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770). The Army does not attempt to justify its Category C withholdings under the competitive-position prong of this test. Therefore, in determining whether the Category C documents are confidential and, thus, fall within Exemption 4, we resolve only the narrow issue of whether the Army satisfied its burden of showing that disclosure of the documents would "impair the Government's ability to obtain necessary information in the future." *Id.* (internal quotation marks omitted).

To satisfy its burden, the Army provided the district court with two affidavits. Ronald J. Buchholz, the Army's Associate Deputy General Counsel, stated in his affidavit that public disclosure of documents similar to the Category C documents would likely result in Clark or a similar entity

being "less willing to share information with the Army," which would "adversely impact[ ] . . . decision-making process[es] with regard to taking actions on behalf of a housing LLC." J.A. 67. And Joseph F. Calcara, Deputy Assistant Secretary of the Army for Installations, Housing, and Partnerships, likewise concluded that "to ensure that the Army's access to high quality information is not impeded, . . . the Army [must] keep information provided by [Clark and similarly situated entities] confidential to the maximum extent permitted by applicable law." J.A. 770. Giving substantial weight to these affidavits as we are required to do, *see* 5 U.S.C. § 552(a)(4)(B), we find, in our de novo review, that public disclosure of the Category C documents would impair the government's ability to obtain necessary information in the future.

The Category C documents, most of which were prepared by Clark's outside counsel, include audit reports, other internal documents, and investigative findings. Clark's purpose in providing these documents to the Army was to present the Army with evidence of Pinnacle's alleged wrongdoing in order to get the Army's approval to terminate and sue Pinnacle. Therefore, as indicated in the *Vaughn* index, the documents contained internal financial and business information about FBFC and FBRC, as well as evidence of the deliberative processes used by counsel for Clark to cull down the relevant documents and present them in a manner to achieve Clark's objective. We have no hesitation in concluding that Clark would prefer not to disclose such documents to the public. Disclosure, in our view, would likely have a chilling effect on a company's decision to initiate litigation in the first place, or, alternatively, to provide a government agency with the same quality and quantity of information that it might otherwise receive. Accordingly, we conclude that public disclosure would impair the government's ability to get this necessary information in the future and that the documents in

Category C are, therefore, confidential and fall within Exemption 4.[6]

Acknowledging that the Army, and not Pinnacle, has the burden to establish application of a FOIA exemption, we nonetheless briefly address Pinnacle's arguments on appeal.

---

[6] In *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992) (en banc), the D.C. Circuit reaffirmed the *National Parks* Test but confined its application "to information that persons are *required* to provide the Government." 975 F.2d at 872 (emphasis added). With regard to information "given to the Government *voluntarily*," the D.C. Circuit held that such information is confidential "if it is of a kind that the provider would not customarily make available to the public." *Id.* (emphasis added) ("*Critical Mass* Test"). Although these tests address different factual scenarios, we note that the considerations made under each test are not mutually exclusive. Confidentiality under the *Critical Mass* Test is broader than confidentiality under the *National Parks* Test, but it includes many, if not all, of the same considerations. In other words, if public disclosure of a document is likely to impair the government's ability to obtain necessary information in the future or cause substantial harm to a company's competitive position, that document will most certainly also contain information that the provider would not customarily make available to the public.

The Army urges us to adopt and apply the *Critical Mass* Test, through which it may more easily establish the confidentiality of the Category C documents. We have not previously adopted the *Critical Mass* Test, *see Wickwire Gavin, P.C. v. United States Postal Serv.*, 356 F.3d 588, 597 (4th Cir. 2004) (declining to "decide which test governs within the Fourth Circuit for determining whether information is confidential"), and we need not do so in this case. We acknowledge that if we were to adopt the *Critical Mass* Test, this case would present a unique circumstance because Clark's disclosures to the Army have both voluntary and obligatory elements. However, because we find that the Category C documents are confidential under the more stringent *National Parks* Test, we need not address the applicability of the less cumbersome *Critical Mass* Test, through which the documents would be clearly confidential. *Cf. McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin.*, 180 F.3d 303, 305-06 (D.C. Cir. 1999) (expressing difficulty in ascertaining the voluntariness of a private company's bid for a government contract but finding documents confidential under the more stringent *National Parks* Test by assuming, *arguendo*, that the disclosure was involuntary).

Pinnacle did not provide the district court with an affidavit attempting to controvert the conclusions of Buchholz and Calcara with regard to future impairment. Instead, Pinnacle first argues that the impairment test for confidentiality is altogether inapposite. According to Pinnacle, because Clark was contractually obligated to get the Army's approval, public disclosure of documents would never impair the government's ability to obtain them. This contention misses the point. It is true that Clark was contractually obligated to get the Army's approval to terminate Pinnacle's property management contracts and to sue Pinnacle. However, Clark was under no obligation to take the actions in the first place, nor was it obligated to provide the Army with a certain quantity or quality of information pursuant to the parties' operating agreements. A chilling effect on these decisions—the decision to initiate litigation and the decision to provide thorough and exhaustive documentation—would no doubt impair the government's ability to obtain necessary information about possible fraud and mismanagement. In the context of a public-private partnership, if the cost of reporting fraud and mismanagement involved public disclosure of confidential financial and business information, private companies would be less apt to report fraud, and less fraud would, therefore, be uncovered. In this case, the fact that Clark had to get the Army's approval under the parties' agreements if it *chose* to initiate litigation is not determinative in the impairment calculus in our view.

Pinnacle also contends that any additional or more thorough information that might be provided under an assurance of its nondisclosure "is not the 'necessary' information FOIA seeks to ensure is available in the future." Brief of Appellant at 17. But whether Pinnacle thinks the information is "necessary" is not the relevant inquiry. *See 9 to 5 Org. for Women Office Workers v. Fed. Reserve*, 721 F.2d 1, 10 (1st Cir. 1983) (interpreting the word "necessary" in Exemption 4 "to reflect Congress' purpose to protect information which would be *particularly helpful to agency officials* in carrying out their

mandate" and rejecting argument that information withheld "must be 'necessary' in the sense of being absolutely *essential* to the operations of the agency or to the governing process itself" (first emphasis added)); *see also National Parks*, 498 F.2d at 767 ("Unless persons having necessary information can be assured that it will remain confidential, they may decline to cooperate with officials and the ability of the Government to make *intelligent, well informed decisions* will be impaired." (emphasis added)). Thus, contrary to Pinnacle's assertions, we find that in the context of the public-private partnerships at issue in this case, having thorough and high-quality information "would be particularly helpful" to the Army in making "intelligent, well informed decisions" about whether to take action against Pinnacle for its alleged wrong-doing.

### B.

We turn now to the Category B documents and consider whether they fall within Exemption 5. The Category B documents consist of communications between the Army and Clark or between the Army and Clark's outside counsel, all of which took place after May 14, 2010, when the Army gave Clark its approval to initiate a lawsuit. The district court found that the Category B documents fell within Exemption 5, which excludes from the FOIA disclosure obligation "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To fall within Exemption 5, a document must (1) be inter- or intra-agency and (2) fall within a discovery privilege. *See Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 371 (4th Cir. 2009). On appeal, Pinnacle does not challenge the Army's ability to establish that the communications are privileged, and we find that the government can satisfy the privilege prong. Thus, we are left to resolve the issue of whether the Category B documents are inter- or intra-agency documents.

1.

Although Clark, the source of the documents, is not a government agency, "in some circumstances a document prepared outside the Government may nevertheless qualify as an 'intra-agency' memorandum under Exemption 5." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001). One such circumstance, relied upon by the district court, is where the common interest doctrine applies. *See Hunton & Williams*, 590 F.3d at 277. "The common interest doctrine permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims." *Id.* We "carefully scrutinize[ ]" a government agency's assertion of a common interest. *Id.* at 274. Therefore, for the common interest doctrine to apply in the context of Exemption 5, "an agency must show that it had agreed to help another party prevail on its legal claims at the time of the communications at issue because doing so was in the public interest." *Id.* The common interest doctrine does not require a written agreement, *see id.* at 287, nor does it require that both parties to the communications at issue be co-parties in litigation, *see In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (collecting cases). However, there must be an agreement or a meeting of the minds. *See Hunton & Williams*, 590 F.3d at 285, 287. "[M]ere 'indicia' of joint strategy as of a particular point in time are insufficient to demonstrate that a common interest agreement has been formed." *Id.* at 285.

To satisfy its burden of establishing the requisite meeting of the minds or agreement to pursue a joint legal strategy, the Army, as before, provided the court with declarations from Joseph F. Calcara and Ronald J. Buchholz. Calcara first emphasized the Army's financial interests in the wellbeing of the military housing projects by noting that the Army is a 49% owner of the entities that control the housing projects and that the Army receives most of the net operating income generated by the housing projects. As a result of this financial

interest, Calcara further discussed the Army's joint legal interest with Clark, explaining that

> the Army has a clear interest in both the manner in which the litigation with Pinnacle is conducted and how the litigation is resolved. The Army's interest is common to that of [Clark] since every dollar spent on litigation expenses either reduces the amount of project net income that is available to recapitalize the Projects' housing stock or increases the likelihood that the Projects will recover some or all of the monetary damages suffered by the Projects because of fraudulent activities perpetrated against the Projects by Pinnacle employees.

J.A. 771. Buchholz reiterated that "[t]he Army . . . shares a common interest with Clark in the ongoing [Georgia] litigation," and he further stated that "[t]his common interest derives . . . from [the] Army and Clark's pre-existing business relationship, . . . through which Clark [as the managing member] has an obligation to protect those housing LLCs' interests, through litigation if necessary." J.A. 68. Finally, Buchholz focused on the Army and Clark's actual agreement, specifying that "the common interest derives from the decision of Mr. Calcara . . . to agree with, and approve, Clark's proposed course of action in initiating litigation." J.A. 69. He further stated, "Although not reduced to writing, the Army and Clark effectively formed a common interest on May 14 when the Army approved Clark's course of action. The actions Clark has taken benefit Soldiers, and thus they are in the Army's interests." J.A. 69.

Pinnacle does not persist in objecting to these affidavits as it did before the district court. Because we have "no reason to question the good faith of the [Army]," we are "entitled to accept the credibility of the affidavits." *Spannaus v. DOJ*, 813 F.2d 1285, 1289 (4th Cir. 1987) (internal quotation marks omitted); *see also* 5 U.S.C. § 552(a)(4)(B) ("[A] court shall

accord substantial weight to an affidavit of an agency concerning the agency's determination as to . . . subsection (b)," which enumerates the FOIA exemptions.). Accordingly, we find that these affidavits, together with the Army's approval, establish the requisite agreement, beginning on May 14, 2010, to terminate Pinnacle's property management contracts at FBFC and FBRC.[7] Furthermore, the Army's declarations clearly explain that terminating Pinnacle was in the public interest. Thus, we find that communications between Clark and the Army occurring after May 14, which include the Category B communications, are protected by the common interest doctrine, qualify as intra-agency communications, and, therefore, fall within Exemption 5.

---

[7]This agreement, on May 14, makes the Category B communications distinguishable from the pre-November 2005 communications in *Hunton & Williams*, for which a remand was ordered. In *Hunton & Williams*, we divided the communications at issue in that FOIA action into two groups, depending on whether they occurred before or after November 2005, when the Department of Justice moved to join in pending litigation and made other explicit expressions of joint legal interest with a non-governmental litigant. Prior to November 2005, the record revealed that the parties' communications involved nothing more than an "exchange[ of] declarations" and "proposed pleadings," with an eye toward "persuading DOJ to become involved in the . . . litigation." 590 F.3d at 285. We remanded the case with regard to those communications for the district court to "determine the point in time when DOJ decided that the public's interest converged with [the private litigant's] interest . . . , [the time] that it wanted [the private litigant] to prevail in its litigation, and [the time] that it would assist [the private litigant] in doing so." *Id.* at 288. Part of our concern was the "danger" that "mere lobbying efforts" would "be removed from FOIA's reach." *Id.* at 285.

Those concerns are not present in the instant appeal, in large part because the Army and Clark were already business partners prior to the events central to this case. *Hunton & Williams* presents a very different circumstance where, prior to November 2005, the government was a mere customer of the non-governmental litigant. Additionally, we know the definite time when the Army and Clark's legal interests officially converged. Because all of the Category B communications occurred after that time, they cannot be characterized as mere pre-decision lobbying efforts, as Pinnacle suggests.

2.

We briefly address Pinnacle's remaining argument. Relying on *Klamath*, Pinnacle argues that Clark's self-interest in terminating Pinnacle's contracts precludes application of Exemption 5—presumably regardless of whether the common interest doctrine would apply—because "communications with federal agencies . . . qualify as 'intra-agency' communications only when they c[o]me from parties completely devoid of any self-interest." Brief of Appellant at 22.[8] *Klamath* did not address the common interest doctrine, and we have previously stated that *Klamath* does "not impact the . . . situation . . . where the two parties [to a communication] share a unitary interest in achieving a litigative outcome and result." *Hunton & Williams*, 590 F.3d at 279. Nevertheless, to provide clarification, we briefly discuss the interplay between the self-interest of a non-governmental party on the one hand, and the public interest on the other.

In *Klamath*, documents passed between Indian tribes and the Bureau of Indian Affairs (the "Bureau") concerning the allocation of a limited water resource, and non-tribal associations seeking the use of the same limited water source filed a FOIA request with the Bureau. The Supreme Court found that the documents did not satisfy the intra-agency requirement of Exemption 5 because the Indian tribes were "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." 532 U.S. at 12. In reaching this conclusion, the Court distinguished the Indian tribes from a paid consultant who provides advice to a governmental agency in order to assist that agency in carrying out its own functions.

In *Hunton & Williams*, we elaborated on this distinction by

---

[8]Pinnacle does not explain what Clark stood to gain by terminating Pinnacle's property management contracts. For the sake of the argument, however, we will assume that Clark had a self-interest in terminating Pinnacle as property manager of FBFC and FBRC.

focusing on whether communications further the public interest. In that case, a technology company sued the manufacturer of BlackBerry smartphones ("RIM") for patent infringement. While an appeal from an injunction was pending, RIM contacted officials in the federal government to impress upon them that "RIM and the federal government had a mutual interest in opposing the BlackBerry injunction because the injunction would interfere with the federal government's BlackBerry use." 590 F.3d at 275. In considering the application of Exemption 5, we found RIM's self-interest to be immaterial in light of the public interest at play, concluding "[i]t d[id] not matter that RIM was motivated by the commercial benefit that would accrue to it if it succeeded in opposing the BlackBerry injunction while the government was motivated by concern for the public interest." *Id.* at 282. Distinguishing *Klamath*, we further noted that "*Klamath* addressed the case of self-interested parties attempting to persuade the government to adopt a particular policy, but those concerns are no longer in play once the government is actually persuaded that the policy is in the public interest." *Id.* at 279.

The communications in Category B occurred after the Army was persuaded that it was in the public interest to terminate Pinnacle's contracts and initiate litigation. *See* Buchholz Decl. at J.A. 69 ("The actions Clark has taken benefit Soldiers, and thus they are in the Army's interests."); Calcara Decl. at J.A. 771-72 ("[T]he Army would not have approved Clark's request to engage in the state court litigation if it did not feel that a successful litigation outcome would benefit . . . the Army."). Therefore, in light of *Hunton & Williams*, because terminating Pinnacle was in the public interest according to the Army, Clark's self-interest in terminating Pinnacle does not preclude a finding that communications between Clark and the Army may qualify as intra-agency communications. *Klamath* is no barrier to the result we reach.[9]

───────────────

[9] Pinnacle finally advances a separate but general argument that the Army did not satisfy its burdens of proof under FOIA and that the district

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment.

*AFFIRMED*

---

court did not subject the Army to these burdens in granting summary judgment. We believe we have addressed the former contention in the preceding sections of this opinion. The latter contention, if true, would not determine the outcome of this case on appeal because "the district court is entitled to no deference" from us. *Wickwire Gavin, P.C.*, 356 F.3d at 591.